# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2108

INDEPENDENT TRUST CORPORATION,
an Illinois corporation now in receivership,

*Plaintiff-Appellant,*

*v.*

STEWART INFORMATION SERVICES CORPORATION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-04430—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 27, 2011—DECIDED JANUARY 6, 2012

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal arises from a series of business dealings that ended in 1995. We conclude that the district court properly dismissed the complaint as barred by the statute of limitations. The Illinois doctrine of adverse domination does not apply to the claims against the defendants here and therefore did not toll the statute of limitations.

In the 1980s and 1990s, Intercounty Title Insurance Co. of Illinois was in the business of issuing title insurance policies and providing real estate closing services. From 1984 through 1995, it served as the exclusive Chicago-area agent for defendants Stewart Information Services Corporation, Stewart Title Guaranty Company, and Stewart Title Company (collectively, "Stewart"). Intercounty eventually grew to become Stewart's largest independent agent. As part of its business, Intercounty created and managed an escrow account. Stewart contractually agreed to insure the escrow funds that Intercounty managed as Stewart's agent. But Intercounty was not profitable. The company was run and controlled by Laurence Capriotti and Jack Hargrove, who decided to invest the real estate escrow funds with which Intercounty was entrusted in various investment schemes. While waiting for the payoff on their "investments" — we use the term loosely — Capriotti and Hargrove used incoming escrow funds to pay off old escrow obligations. In other words, they ran the Intercounty escrow account as a Ponzi scheme.

Their investments failed. By the end of 1989, there was a $26 million shortfall in the Intercounty escrow account. When Stewart learned of the shortfall, it pressured Intercounty to bring the account into balance. Stewart also allowed Intercounty to fire its auditors.

Capriotti and Hargrove were also directors of the plaintiff in this case, Independent Trust Corporation (known here as "InTrust"). InTrust was the trustee for nearly 20,000 trust accounts, primarily individual retire-

ment accounts, collectively valued at over $1 billion. To fill the hole in the Intercounty escrow account, Capriotti and Hargrove began looting InTrust. They transferred tens of millions of dollars in InTrust account holder funds to Intercounty, which used the transferred funds to pay amounts owed from its escrow account. Some of this money went to pay Stewart policyholders, and some of it went to pay Stewart directly.

Stewart therefore was a direct and indirect beneficiary of the Intercounty/InTrust arrangement. If Intercounty had not been able to make its escrow payments, Stewart, as the insurer of the escrow funds, would have had to cover the losses. But between December 1990 and the end of 1995, when Intercounty terminated its relationship with Stewart, $40.9 million of InTrust account holder funds had been transferred to the Intercounty escrow account to cover Stewart's insureds. As much as $27 million of InTrust account-holder funds were transferred directly to Stewart or to third parties for Stewart's benefit.

The Illinois Commissioner of the Office of Banks and Real Estate ("OBRE") began investigating InTrust's relationship with Intercounty in 1994, but it was not until February 2000 that the OBRE learned that the funds InTrust had transferred to Intercounty were missing. A few months after that, on April 14, 2000, the OBRE took control of InTrust and placed it in receivership. PricewaterhouseCoopers LLP was appointed receiver, and on behalf of InTrust, pursued civil suits against Capriotti, Hargrove, Intercounty, and ITI Enterprises, Inc.

(another Capriotti and Hargrove company). The Receiver obtained judgments against these defendants in the amount of $68 million. The judgment against Hargrove was overturned on appeal, but the Receiver settled its claims against Hargrove for $50 million.[1]

This background brings us to this case, and this appeal. On July 15, 2010, the Receiver filed a five-count complaint against Stewart on behalf of InTrust. Its claims included money had and received (Count I), unjust enrichment (Count II), vicarious liability for Intercounty's tortious conduct (Count III), aiding and abetting breach of fiduciary duty (Count IV), and conspiracy (Count V). Stewart moved to dismiss for failure to state a claim under Rule 12(b)(6), arguing that the Receiver's claims were barred by the applicable statute of limitations. The Receiver relied on the doctrine of adverse domination to argue that the statute of limitations was tolled at all times before April 2000. Under Illinois law, this doctrine is defined as "an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors." *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 170 (Ill. App. 1999). The doctrine also applies to claims against other parties who are co-conspirators of the wrong-

---

[1] Capriotti and Hargrove were also indicted on federal criminal charges. Capriotti pled guilty in June 2005, admitting that he and Hargrove had participated in a scheme to defraud InTrust. Hargrove went to trial and was convicted on ten counts of the indictment, which included allegations that he had participated in a scheme to defraud InTrust.

doing directors. See *id*. at 172. The district court granted Stewart's motion and dismissed the Receiver's claims on the statute of limitations defense. The Receiver moved to alter or amend the judgment under Rule 59(e), and the district court denied its motion.

The Receiver appeals. On the merits, it argues first that the district court erred by holding that the adverse domination doctrine does not apply to non-conspirators of wrongdoing directors, and second that even if the district court's holding is correct, the complaint suf-ficiently alleges that Stewart was a co-conspirator in Capriotti's and Hargrove's looting of InTrust. The Receiver also argues that, in ruling on Stewart's motion to dismiss, the district court improperly took judicial notice of adjudicative facts and erred by granting the motion to dismiss with prejudice without first permitting the Receiver to file an amended com-plaint. We affirm.[2]

I. *Standard of Review*

We review de novo a district court's order granting a Rule 12(b)(6) motion to dismiss based on the statute of

---

[2] Because we affirm the district court on the statute of limita-tions, we need not discuss Stewart's arguments on the merits of the Receiver's claims. Stewart Br. 43-49. We also do not address Stewart's argument in a footnote that the Receiver's allegations fail to establish for purposes of the Illinois adverse domination doctrine that a majority of InTrust's board members were wrongdoers.

limitations. See *Middleton v. City of Chicago*, 578 F.3d 655, 657 (7th Cir. 2009). In doing so, we take "all well-pleaded allegations of the complaint as true and view[ ] them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). To satisfy the notice-pleading standard of the Federal Rules of Civil Procedure, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the plaintiff's complaint must be sufficient to provide the defendant with "fair notice" of the plaintiff's claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Supreme Court also instructs us to examine whether the allegations in the complaint state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, quoting *Twombly*, 550 U.S. at 570. The complaint "must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services*, 536 F.3d 663, 668 (7th Cir. 2008) (emphasis in original), quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008).

But a plaintiff's claim need not be probable, only plausible: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation omitted). To meet this plausibility standard, the complaint must supply "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Id*.

Here, the district court dismissed the Receiver's claims upon finding that the applicable statute of limitations had run. A statute of limitations provides an affirmative defense, and a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses. But when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate. See *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009). When reviewing a Rule 12(b)(6) dismissal of state law claims based on a statute of limitations, we apply state law regarding the statute of limitations and "any rules that are an integral part of the statute of limitations, such as tolling and equitable estoppel." *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010).

II.  *Adverse Domination Doctrine under Illinois Law*

The parties do not contest the district court's finding that the acts giving rise to the Receiver's claims occurred no later than August 1996. Under Illinois law, a five-year statute of limitations governs the Receiver's claims.

735 ILCS 5/13-205. Thus, the statute of limitations on the Receiver's claims ran, at the latest, in August 2001. The parties signed a tolling agreement on October 12, 2001. The question is whether the tolling agreement came too late to save the Receiver's claims.

On April 14, 2000, the OBRE took control of InTrust and placed it in receivership. Prior to April 14, 2000, Capriotti and Hargrove controlled InTrust, and the Receiver argues that the statute of limitations was tolled until that date by the doctrine of adverse domination, which "tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors*." Larney*, 719 N.E.2d at 170. The doctrine is an extension of the Illinois discovery rule, which tolls the statute of limitations until a plaintiff knows or should know that he has been injured and that his injury was wrongful. Because a plaintiff-corporation can learn that it has been injured only through the knowledge of its agents, if the agents' interests are adverse to the corporation, the agents' knowledge is not imputed to the corporation. "The rationale behind this doctrine is 'that control of the board by wrongdoers precludes the possibility for filing suit since these individuals cannot be expected to sue themselves or initiate action contrary to their own interests.'" *Larney*, 719 N.E.2d at 170, quoting *Federal Deposit Insurance Corp. v. Greenwood*, 739 F. Supp. 450, 453 (C.D. Ill. 1989). The key to this case is that, in Illinois, the doctrine applies to causes of action against the wrongdoing directors, but also to causes of action against co-conspirators of the wrongdoers. *Id*.

at 172. Here, the district court found that the adverse domination doctrine, as articulated in *Larney*, would not operate to save the Receiver's claims against Stewart because the doctrine tolls a corporation's claims only against wrongdoing directors and co-conspirators, and because Stewart fits in neither category.

In seeking to overturn the dismissal, the Receiver first argues that a finding of conspiracy is not necessary to toll claims against Stewart under the adverse domination doctrine as articulated in *Larney*. Alternatively, if the doctrine will preserve claims only against directors and their co-conspirators, the Receiver argues that Stewart was a co-conspirator in Hargrove's and Capriotti's wrongdoing and that the adverse domination doctrine applies. We disagree with the Receiver on both points and affirm the district court.

The Receiver first faults the district court for beginning and ending its analysis with *Larney*, a decision by the Appellate Court of Illinois, without making an attempt "to predict how the Illinois Supreme Court would rule on the scope of the adverse domination doctrine." By analyzing and applying the Appellate Court's reasoning in *Larney*, the district court did exactly what it should have. Where a state's supreme court "has not yet passed on an issue, we examine decisions of the lower state courts to help formulate an answer." *Kaplan v. Shure Brothers, Inc.*, 153 F.3d 413, 420 (7th Cir. 1998). The *Larney* court was the first and is so far the only Illinois appellate court to discuss the adverse domination doctrine, and its holding has not been undermined by intervening

Illinois precedent. The district court was correct to give it persuasive weight.

On the merits, the Receiver argues that a formal claim for civil conspiracy is not a prerequisite for adverse domination under Illinois law and that the district court misread *Larney*. The Receiver contends that its broader reading of *Larney* is appropriate and that the Illinois Supreme Court "would likely find that adverse domination tolls the statute of limitations for corporate claims against third parties if pursuit of such claims would bring to light the directors' misconduct, regardless of whether plaintiff includes a claim for civil conspiracy against the third parties and regardless of whether a conspiracy existed to commit the wrongdoing." We agree with the district court that, without a sufficient showing that Stewart was a co-conspirator in Capriotti's and Hargrove's looting of InTrust account funds, the Illinois adverse domination doctrine as defined in *Larney* will not save the Receiver's claims against Stewart.

The Receiver focuses first on the fact that, in spite of its language that the adverse domination doctrine "applies to toll the statute of limitations for a cause of action by a corporation against a nonboard-member co-conspirator of the wrongdoing board members," the *Larney* court permitted the plaintiffs' claims to go forward even though they had not brought a formal conspiracy claim against the defendants. The Receiver quotes, in full, the "relevant portion" of *Larney*. The added emphasis is ours:

We believe that the fact that two of the defendants in this case were not members of the Board does not automatically render the adverse domination doctrine inapplicable. Both [defendants] Larney and Midland were alleged co-conspirators of [wrongdoing board members] Lopinski and Lipinski. *Just as a board comprised of a majority of wrongdoers could not be expected to file suit against itself, such a board could not be expected to file suit against a nonboard-member co-conspirator because such action would necessarily bring to light its own wrongdoing and would be adverse to its own interests.* The rationale behind the adverse domination doctrine applies equally *to causes of action against co-conspirators*. We find that the adverse domination doctrine applies to toll the statute of limitations for *a cause of action by a corporation against a nonboard-member co-conspirator* of the wrongdoing board members.

*Larney*, 719 N.E.2d at 172 (emphasis added). *Larney* did not hold that a formal conspiracy claim is necessary for the adverse domination doctrine to apply.[3] But, clearly, the

---

[3]  Neither did the district court. The Receiver quotes the relevant portion of *Larney*, and then states, incorrectly, that "[t]he district court interpreted this language to mean that properly stating a claim for civil conspiracy was a prerequisite for adverse domination tolling with respect to claims against non board members . . . . The district court concluded that it was the formal inclusion of a conspiracy count that mattered." The district court did no such thing. It stated instead, "Thought

(continued...)

*Larney* court found that even without a formal claim, the plaintiffs had sufficiently alleged that the *Larney* defendants were co-conspirators of the controlling, wrongdoing board members. See *id*. A formal *claim* of conspiracy is not necessary. But in articulating the doctrine in Illinois, the *Larney* court made clear that a plaintiff's *allegations* must establish that the defendant was complicit in the wrongdoing of the directors for the adverse domination doctrine to toll the statute of limitations.[4]

---

[3] (...continued)
[sic] [the Receiver] applies the label of coconspirator to Stewart, [the Receiver's] brief contains no reference to *specific allegations* in the Complaint in support of that Conclusion. The cited paragraphs of the Complaint contain no *allegations of conspiracy* between InTrust's board and Stewart to support this conclusion." *Independent Trust Corp. v. Stewart Information Services Corp.*, 2011 WL 529390, at *5 (N.D. Ill. Feb. 7, 2011) (emphasis added).

[4] And not just any directors, but the directors of the corporate plaintiff. This case is muddied because Hargrove and Capriotti each wore two hats based on their roles with both Intercounty and InTrust. At Intercounty and as Intercounty officers, Hargrove and Capriotti misused escrow funds. At InTrust *and as InTrust directors*, they pilfered account funds. The Receiver, representing InTrust, is attempting to bring claims against Stewart. For the adverse domination doctrine to apply to preserve *InTrust's* claims, the Receiver's allegations must demonstrate that Stewart conspired with Hargrove and Capriotti *in their role as InTrust directors*, so the Receiver must show that Stewart conspired in the scheme to siphon money out of InTrust accounts.

The Receiver argues that *Larney* used the word conspirator "loosely," and that instead of looking at the identity of the defendant, courts applying Illinois law should examine the nature of the proposed cause of action. If the cause of action necessarily would have exposed the underlying wrongdoing of the controlling officers or directors, the Receiver argues, the rationale of the adverse domination doctrine as expressed by the *Larney* court should extend to that cause of action. Receiver Br. 21 ("The Illinois Appellate Court allowed the plaintiffs to proceed against third-parties without a conspiracy count because their cause of action implicated the directors and, thus, was something the directors would never have permitted to be filed while they controlled the company."). We appreciate the Receiver's reasoning and acknowledge that it suggests a plausible extension of the adverse domination doctrine. But we are not persuaded that we should extend Illinois law beyond the clear bounds of *Larney*, in which the court stated explicitly: "We find that the adverse domination doctrine applies to toll the statute of limitations for a cause of action by a corporation against a *nonboard-member co-conspirator* of the wrongdoing board members." *Id*. at 172 (emphasis added). The Receiver's interpretation would require a significant extension of the adverse domination doctrine under Illinois state law, with consequences that we cannot foresee clearly. Unless and until the Illinois courts address this question, we rely on the boundaries of the doctrine as stated in *Larney*, and we refrain from extending the doctrine of adverse domination beyond wrongdoing directors and their co-conspirators.

Finally, the Receiver argues that Illinois cases applying the discovery rule and adverse domination cases from other jurisdictions support its contention that the Illinois Supreme Court would extend the adverse domination doctrine to preserve the Receiver's claims against Stewart. The Illinois discovery rule operates to preserve a claim until the plaintiff knows or reasonably should know that he or she has been wrongfully injured. See *Larney*, 719 N.E.2d at 170, citing *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135 (Ill. 1995); *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627, 630-31 (Ill. 1994). And as the Receiver points out, the Illinois discovery rule "has been applied across a broad spectrum of litigation to alleviate what has been viewed as harsh results resulting from the literal application of the statute." Receiver Br. 23, quoting *Knox College v. Celotex Corp.*, 430 N.E.2d 976, 979 (Ill. 1981). But the *Larney* court had the discovery rule and its supporting policy at its fingertips. It clearly considered the Illinois discovery rule and its implications for corporate plaintiffs. It recognized that the adverse domination doctrine was a logical extension of the discovery rule and related agency principles, *Larney*, 719 N.E.2d at 170, but, once again, it drew the boundary at wrongdoing directors of the plaintiff corporation and their co-conspirators, and no further. *Id*. at 172. We are not persuaded we should predict the extension of the doctrine beyond the boundary set thus far by the Appellate Court of Illinois.

The Receiver also cites adverse domination cases from other jurisdictions and asks us to extend the rationales expressed in those cases to Illinois. But where an Illinois

appellate court has spoken clearly on the issue, we have no reason to look beyond Illinois for guidance. Here, Illinois law seems sufficiently clear. Accordingly, we affirm the district court concerning the boundaries of the Illinois adverse domination doctrine. The doctrine can help the Receiver here only if it can show (or for now at least allege) that Stewart conspired with InTrust's directors to steal from InTrust account holders.

### III. *Conspiracy*

The Receiver contends that it has satisfied the requirements of the adverse domination doctrine by alleging that Stewart conspired with Capriotti and Hargrove to take InTrust funds for the benefit of Intercounty. In Illinois, a civil conspiracy is defined as "'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.'" *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999), quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565, 571 (Ill. 1998). A plaintiff must allege facts establishing both (1) an agreement to accomplish such a goal and (2) a tortious act committed in furtherance of that agreement. *McClure*, 720 N.E.2d at 258. Thus, for the Illinois adverse domination doctrine to apply, the allegations in the Receiver's complaint, read in its favor, must suggest plausibly that Stewart "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill.

1994).[5] Stated differently, "[t]here is no such thing as accidental, inadvertent or negligent participation in a conspiracy." *Id*. Stewart must have "under[stood] the general objectives of the conspiratorial scheme, accept[ed] them, and agree[d], either explicitly or implicitly to do its part to further those objectives." *Id*. The district court found that the Receiver's allegations do not amount to a conspiracy between Stewart and the InTrust directors under Illinois law, and we agree.

The Receiver argues that its complaint incorporates factual allegations supporting all the elements of conspiracy under Illinois law. Like the district court, we narrow our focus to only one of those elements: an *agreement* between Stewart and InTrust to misappropriate InTrust funds. The Receiver's complaint consists of 90 pages and 214 paragraphs and is flush with detail regarding Hargrove's and Capriotti's various misdeeds. But it fails to link Stewart to the InTrust fraud by plausibly suggesting that Stewart participated in that fraud as a co-conspirator. Simply stated, the Receiver's allegations do not plausibly support the inference that Stewart agreed, either explicitly or implicitly, that Hargrove and Capriotti should raid the funds of InTrust account holders.

We begin by taking a careful look at the Receiver's allegations concerning what Stewart did, what it did not

---

[5] Again, not just any "unlawful act," but Hargrove's and Capriotti's scheme, as InTrust's directors, to raid the funds of InTrust account holders.

do, what it knew, and what it did not know regarding Intercounty and InTrust. The Receiver's complaint alleges that in November 1984, Stewart appointed Intercounty as its exclusive Chicagoland agent. The underwriting agreement gave Stewart the right to audit Intercounty's escrow accounts and other financial statements and to terminate the agreement if Intercounty did not manage its escrow funds appropriately. Compl. ¶¶ 30-31. Until February 1991, Stewart owned stock in Intercounty, which gave it the right to receive monthly financial statements and annual audited financial statements from Intercounty. Compl. ¶ 26. The Receiver alleges that the financial statements that Stewart received and reviewed showed that Hargrove and Capriotti were using the Intercounty escrow account improperly to fund various schemes, including a mortgage defeasance program and junk bonds. Compl. ¶¶ 42-43. Stewart became aware of these schemes. It directed Intercounty not to enter into any more defeasance transactions and to sell its junk bonds. But Stewart did not force Intercounty to limit its exposure and did not terminate its agreement with Intercounty. Compl. ¶¶ 50-54.

When Intercounty's escrow "investments" failed, leaving a multi-million dollar shortfall in the escrow account, Intercounty disclosed the shortfall to Stewart via Intercounty's audited and reviewed financial statements. Compl. ¶¶ 80-83, 87. InTrust alleges that Stewart knew that there was no way Intercounty's business operations could cover the shortfall, and it also knew that it was liable for the shortfall as the title insurer. Compl. ¶¶ 88-93,

96-97. Again, instead of terminating the agreement, Stewart allowed Intercounty to continue running the escrow account "on the float" and left it to Capriotti and Hargrove to find a solution for the shortfall. Compl. ¶ 98.

Continuing to give the Receiver the benefit of all its allegations, Stewart knew by this point that Intercounty was willing to misuse escrow funds, it knew that Capriotti and Hargrove had purchased InTrust, and "it also knew that the only untapped escrow account controlled by Intercounty was the one containing the funds of InTrust's clients." Compl. ¶¶ 111-12, 134-36, 138. Even though it had this knowledge, Stewart waived Intercounty's contractual obligation to submit to an annual audit. Compl. ¶ 102. It also "pressured" and "demanded" that Intercounty find a source of funds to fill the escrow gap. Compl. ¶¶ 4, 105, 108, 110. By the end of 1996, Capriotti and Hargrove had caused InTrust to deposit over $45 million of InTrust account funds into the Intercounty escrow account. Compl. ¶¶ 114, 116. Without Stewart's financial oversight, Intercounty was able to "steal tens of millions of dollars from InTrust and pay much of the InTrust money to or for the benefit of Stewart." Compl. ¶ 102.

Fundamentally, the Receiver's argument is that the pressure Stewart exerted on Intercounty to fill the escrow gap, combined with its failure to prevent the fraud by either demanding an audit or terminating its underwriting agreement, amounts to Stewart's implicit agreement that Hargrove and Capriotti, in their role as InTrust directors, should fraudulently siphon money

from InTrust accounts to fill the Intercounty escrow shortage. We do not agree that these ingredients amount to a Stewart-InTrust conspiracy. The Receiver has simply failed to allege *an agreement*. Urging Intercounty to resolve its escrow shortage, no matter how strenuously, was not an implicit or explicit agreement that Intercounty should resolve its escrow shortage by embezzling funds from InTrust. See, *e.g.*, *Bosak v. McDonough*, 549 N.E.2d 643, 646 (Ill. App. 1989) (attorney who advised realtor to cover shortage in his escrow account, but did not agree to perpetrate fraud against investor, could not be held liable for civil conspiracy). And the Receiver points to no authority supporting its assertion that Stewart's failure to do more to prevent the fraud makes it a co-conspirator in the fraud. To the contrary, our precedent holds that, in the absence of any evidence of an explicit or implicit agreement, a defendant's failure to prevent harm to a plaintiff does not amount to a conspiracy. See *Tierney v. Vahle*, 304 F.3d 734, 739-40 (7th Cir. 2002).

Finally, relying on *Hartford Accident and Indemnity Co. v. Sullivan*, 846 F.2d 377 (7th Cir. 1988), the Receiver argues that because Stewart directly and indirectly benefitted from the fraud, it should be held liable as a co-conspirator. But *Sullivan* is easily distinguishable. In *Sullivan*, we reversed a trial court's finding that a lawyer could not be held liable as a co-conspirator in a scheme to defraud a bank of millions of dollars when the lawyer had acted as a direct participant in only one loan underlying the larger scheme. We relied in part on the fact that the lawyer had benefitted from the larger

scheme. We recognized that as the larger scheme grew, the conspirators' demands for the lawyer's legal work increased, and proceeds from other fraudulent loans were used to pay the interest due on the loan in which he was a participant. *Sullivan*, 846 F.2d at 384. But the evidence at trial also established that the lawyer was a knowing participant in the fraud. He had assisted in launching the scheme and knew that it was continuing. The only issue was whether the lawyer could be held liable for the entire scope of the fraud, or only the smaller fraudulent transaction in which he participated. *Id*. at 385 ("We hold that under Illinois law one who participates actively in launching a conspiracy with limited aims, who knows that the aims have been exceeded, and who knowingly obtains direct monetary benefits from the expanded conspiracy, is a participant in that conspiracy as well as in the narrower one from which it grew."). Here, although Stewart may have been a beneficiary of Hargrove's and Capriotti's misdeeds, the allegations in the complaint do not plausibly suggest that Stewart launched the Intercounty escrow shortage or that it knew of or was complicit in the underlying fraud against InTrust.

Moreover, as the district court noted, the Receiver's speculative and conclusory assertion of a Stewart-InTrust conspiracy is belied by other allegations in the Receiver's complaint that Stewart was entirely ignorant of InTrust's wrongdoing. For instance, the Receiver alleges: "Stewart didn't know the details of how Intercounty had stayed in business." Compl. ¶ 141; see also Compl. ¶ 144 (on March 14, 1995, after Intercounty sent Stewart copies of checks deposited into the escrow

account, Stewart asked to confirm the source of the payments because "there is no way of knowing, for instance, where Intercounty got the money to fund the escrow account recently."). How could Stewart "act in concert" with Hargrove and Capriotti to steal InTrust money, as the Receiver speculates, if Stewart did not know the details of how Intercounty had stayed in business or how it was replenishing the depleted escrow account? The Receiver does not meaningfully answer that question. Without plausible allegations that Stewart had knowledge of Hargrove's and Capriotti's fraud against the InTrust account holders and acted to help them succeed, the Receiver has failed to allege a conspiracy that included Stewart.

Along these same lines, the Receiver also alleges that in 1995, Stewart "pressured for an audit and a 'restructuring' of its relationship with Intercounty, and . . . told Capriotti that if Intercounty did not restore the shortages in its escrow account, [it] would be obligated to contact the Illinois Department of Financial Institutions." Compl. ¶ 142. Stewart sent its internal auditors to Intercounty several times, "but Intercounty never would give them enough information or time to finish their work." Finally, in December 1995, Intercounty terminated its association with Stewart. Compl. ¶ 147. Stewart's only possible inroad to obtain knowledge of the means by which Intercounty's operation was being funded (the InTrust fraud) was shut down by Intercounty. Not only is it implausible that alleged co-conspirators would behave and communicate in this manner, but these allegations show that Intercounty was actively

trying to prevent Stewart from uncovering the truth about the InTrust fraud. Without knowledge of the scheme, Stewart could not have agreed to it.

In sum, none of the allegations cited by the Receiver support an inference that Stewart knew of, let alone agreed to, any unlawful activity involving misappropriation of InTrust funds. Without a knowing agreement, there can be no conspiracy, and without a conspiracy, the Illinois adverse domination doctrine cannot apply to a non-director. Because the adverse domination doctrine does not apply, the Receiver's claims are barred by the applicable statute of limitations, and the Receiver has pled itself out of court. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (a plaintiff can plead himself out of court by pleading facts that show he has no legal claim); see also *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court — that is, admits all the ingredients of an impenetrable defense — may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."). Accordingly, we affirm the district court's dismissal of the Receiver's claims, all of which are governed by a five-year statute of limitations.

IV. *"Judicial Notice" and Opportunity to Amend*

Finally, the Receiver contends that the district court erred in two other respects, neither of which is persuasive. It asserts that in ruling on Stewart's motion to dismiss, the district court erred by taking judicial notice of adjudicative facts, particularly the Hargrove indict-

ment, the Capriotti plea agreement, and the court's opinion in *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 2008 WL 4348594 (N.D. Ill. Mar. 26, 2008). Before addressing the Receiver's argument, we must reframe it. We do so primarily by quoting the passage on which the Receiver's argument is based, which largely speaks for itself.

After the district court ruled in favor of Stewart and dismissed the Receiver's claims, the Receiver moved to alter or amend the judgment pursuant to Rule 59(e). The district court denied the motion. On page five of the district court's eleven-page opinion denying the Receiver's motion to alter or amend, the district court said in a footnote:

> That InTrust has filed a Rule 59(e) motion that more or less regurgitates its arguments from the motion to dismiss briefing is not surprising. InTrust's Complaint is essentially its last gasp in a marathon of civil litigation. *A brief summary of the criminal and civil litigation that relates to this case is as follows.* In June 2005, Capriotti pled guilty to participating with Hargrove in a scheme to defraud, among others, InTrust, [Stewart], and Fidelity, and misusing Intercounty escrow funds. Capriotti's plea agreement refers to multiple instances in which the former InTrust and Intercounty principals deliberately manipulated records to conceal escrow deficiencies from [Stewart]. In September 2005, a jury convicted Hargrove on ten counts, including a finding that Hargrove participated in a scheme to

defraud, among others, InTrust, [Stewart], and Fidelity. Around the time InTrust and Intercounty collapsed in 2000, Fidelity filed *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, No. 00-cv-5658, 2008 WL 4348594, at *1 (N.D. Ill. Mar. 26, 2008) (*Fidelity*), against Intercounty, Capriotti, Hargrove, INTIC and numerous others, including [Stewart], making similar allegations as InTrust makes in its Complaint here. In 2008, Judge Norgle granted [Stewart's] motion for summary judgment on all remaining claims, finding: "Intercounty and its executives did whatever they could to keep Stewart in the dark regarding any escrow account deficiencies at . . . Intercounty." *Id*. at *6. In 2005, the Receiver filed *Independent Trust Corp. v. Fidelity Nat. Title Ins. Co. of New York*, 577 F. Supp. 2d 1023 (N.D. Ill. 2008), seeking $68 million based on Fidelity's relationship from 1995 through 2000 with Intercounty, Capriotti, and Hargrove, making claims that were similar to those made against Stewart in the instant Complaint. On August 26, 2008, Judge Pallmeyer granted summary judgment for Fidelity on InTrust's remaining claims. *Id*. at 1037-52.

*Independent Trust Corp. v. Stewart Information Services Corp.*, 2011 WL 1831586, at *3, n.1 (N.D. Ill. May 11, 2011) (emphasis added and internal record citations omitted). When the "adjudicative facts" are read in the proper context, it is apparent that the Receiver's argument is specious. The district court was reciting the long procedural history of this case. The Hargrove indictment, the Capriotti plea agreement, and *Fidelity v. Intercounty* are documents in the public domain that further that proce-

dural narrative. The district court took judicial notice of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences. The district court did not rely on the documents as proof of disputed facts in any other sense.

Finally, the Receiver argues that the district court abused its discretion by dismissing the initial complaint with prejudice without allowing an opportunity to amend. Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading. A plaintiff is entitled to amend the complaint once as a matter of right if it acts quickly enough, see Fed. R. Civ. P. 15(a), and even after that time has expired, a court "should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see also *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010), citing *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007). In applying Rule 15(a), the uncertainty in pleading standards resulting from the Supreme Court's decisions in *Iqbal* and *Twombly* also provides powerful reasons to give parties a reasonable opportunity to cure defects identified by a district court. Here, however, the Receiver did not request the opportunity to amend until its motion to amend or alter and, most important, did not offer any meaningful indication of how it would plead differently. See *Hecker v. Deere & Co.*, 556 F.3d 575, 590-91 (7th Cir. 2009) ("Once judgment has been entered, there is a presumption that the case is finished, and the burden is on the party who wants to upset that judgment to show the court

that there is good reason to set it aside."), citing *Vicom, Inc. v. Harbridge Merchant Services*, 20 F.3d 771, 785 (7th Cir. 1994) (faulting plaintiff for not attaching a proposed complaint or specifically informing the court of how it would cure deficiencies in the earlier complaint); *Twohy v. First National Bank*, 758 F.2d 1185, 1189, 1197 (7th Cir. 1985) (same). Instead, the Receiver put it to the district court to identify what it needed to plead to succeed, telling that court: "[T]he Court should specifically address the conspiracy allegations and explain why they are deficient. And instead of dismissing the complaint with prejudice, the Receiver should be given leave to replead its conspiracy allegations to correct whatever deficiencies the Court identifies."

In support of its argument on appeal, the Receiver contends only that when its complaint was dismissed, it had filed only one complaint on behalf of InTrust. (It does not try to assign us the task of re-pleading for it, as it did the district court.) The Receiver offers no argument at all against futility, and it is well settled that a district court may refuse leave to amend where amendment would be futile. See *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008), citing *Airborne Beepers*, 499 F.3d at 666. Nothing the Receiver has brought forward so far, either in its complaint allegations, its arguments in favor of its motion to alter or amend, or its arguments on appeal, sufficiently supports its theory that Stewart knowingly and intentionally conspired with InTrust. Based on the Receiver's own allegations, Stewart did not know of Hargrove's and Capriotti's InTrust malfeasance. Without knowledge of Hargrove's and Capriotti's activities and

purpose, Stewart could not have conspired in their fraud. In the absence of any suggestion of how the Receiver might overcome these self-created hurdles if it were to replead, the district court did not abuse its discretion in denying the Receiver that opportunity.

AFFIRMED.