In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 16-1075, 16-1132, 16-1133, 16-1143, 16-1148, 16-1160, 16-1161, 16-1164, 16-1165, 16-1235

IN RE: EMERALD CASINO, Inc.

*Plaintiff-Debtor*,

FRANCES GECKER, as Trustee of Emerald Casino, Inc.
*Plaintiff-Appellee/Cross-Appellant,*
*Plaintiff-Appellant/Cross-Appellee,*

*v.*

ESTATE OF KEVIN FLYNN, JOHN MCMAHON, KEVIN LARSON, JOSEPH MCQUAID,

*Defendants-Appellants/Cross-Appellees,*

*and*

ESTATE OF PEER PEDERSEN,

*Defendant-Appellee/Cross-Appellant*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 4714 — **Rebecca R. Pallmeyer**, *Judge.*

_____

ARGUED MAY 31, 2017 — DECIDED AUGUST 11, 2017

———————————

Before Kanne, Sykes, and Hamilton, *Circuit Judges*.

Kanne, *Circuit Judge*. This case arises out of the Illinois Gaming Board's decision to revoke Emerald Casino, Inc.'s[1] gaming license. In an attempt to recover the value of the license, the bankruptcy trustee sued the defendants—former Emerald officers, directors, and shareholders—for breach of contract and breach of their fiduciary duties.

This set of consolidated appeals concerns the district court's decision on those claims.

Defendants Kevin Flynn, John McMahon, Kevin Larson, and Joseph McQuaid contest the court's decision that their conduct caused the Board to revoke Emerald's license. The defendants thus argue that the court could not have held them severally liable for the value of Emerald's license.

The trustee contests the court's decision that (1) defendant Peer Pedersen's conduct did not cause the Board to revoke Emerald's license, (2) the statute of limitations barred her breach-of-fiduciary-duty claim, and (3) the defendants were severally liable instead of jointly and severally liable.

We reverse and remand the court's decision to hold the defendants severally liable instead of jointly and severally liable. But otherwise, we affirm.

———————————

[1] Emerald Casino, Inc. was originally called HP, Inc. In 1994, HP changed its name to Emerald Casino, Inc. For sake of clarity, we simply refer to those entities as "Emerald" throughout the opinion.

## I. BACKGROUND[2]

Emerald had an Illinois gaming license to operate in East Dubuque, Illinois. Emerald operated profitably in 1993 but then began to struggle to compete with a new Dubuque, Iowa casino. Iowa's more lenient gaming laws made continued success for Emerald in East Dubuque unlikely, so Emerald applied to the Illinois Gaming Board for permission to relocate. The Board denied the application, claiming that it lacked the statutory authority to allow a licensee to relocate.

By early 1996, Emerald had stopped operating a casino and began devoting its time to lobbying the Illinois legislature to pass an act that would allow it to relocate. In the meantime, it had to renew its gaming license. The Board voted unanimously to deny Emerald's renewal application, citing Emerald's "non-responsive application," "inadequate gaming operation," financial inviability, "significant compliance shortcomings," failure to "provide for positive economic development and impact," and general noncompliance with the Riverboat Gambling Act. *In re Emerald Casino, Inc.*, 530 B.R. 44, 64 (N.D. Ill. 2014) (quoting the Board's denial of Emerald's application to renew its license). Emerald appealed that decision to an Illinois administrative law judge, who agreed with the Board and recommended denying Emerald's renewal application.

But before the Board could officially adopt the administrative law judge's recommendation, Emerald's lobbying efforts succeeded. On May 25, 1999, the Illinois legislature passed 230

---

[2] We have simplified the facts in this case. Anyone interested in a blow-by-blow account of this dispute can find the district court's exhaustive opinion at *In re Emerald Casino, Inc.*, 530 B.R. 44 (N.D. Ill. 2014).

ILCS 10/11.2, which provides that a "licensee that was not conducting riverboat gambling on January 1, 1998 may apply to the Board for renewal and approval of relocation … and the Board shall grant the application and approval upon receipt by the licensee of approval from the new municipality or county … in which the licensee wishes to relocate." A month later, the Governor signed § 11.2 into law.

Emerald had its win: the Board interpreted the word "shall" in the statute to mean that it was required to renew Emerald's license and grant Emerald's request to relocate. The Board thus withdrew its decision to deny Emerald's renewal application.

Anticipating its political victory, Emerald began considering new relocation sites well before the legislature passed § 11.2. Specifically, Emerald considered Rosemont, Illinois. Several times during 1998—a year before § 11.2 passed—Kevin Flynn[3] and McQuaid met with Rosemont's mayor and representatives of two Rosemont corporations about moving Emerald to Rosemont. Evidence at trial suggested that, at those meetings, Kevin Flynn at least discussed selling significant ownership interests in Emerald to Rosemont's mayor and the two Rosemont corporations.

And once the legislation passed, Emerald moved quickly. It sent a formal relocation request to Rosemont just five days after the Governor signed § 11.2; Rosemont agreed that day. Within months after § 11.2 passed, Emerald and Rosemont

---

[3] We refer to Kevin Flynn by his full name because his father Donald Flynn also appears in this opinion. Donald Flynn was a defendant in the proceedings below, but he settled with the bankruptcy estate instead of appealing the district court's decision.

had executed a site access agreement and a letter of intent to memorialize the terms of Emerald's relocation to Rosemont. Yet later when the Board asked when Emerald first considered Rosemont as a relocation site, Kevin Flynn and McQuaid lied and said that Emerald had not considered Rosemont until after § 11.2 passed. Emerald did not disclose its agreements with Rosemont until well over a year after the contracts were signed, in violation of Illinois Gaming Board (IGB) rules. *See, e.g.*, Ill. Admin. Code tit. 86, § 3000.110(a)(5) ("A holder of any license shall be subject to imposition of fines, suspension or revocation [for] … fail[ing] to cooperate with any officially constituted investigatory or administrative body.").

Emerald's dealings in Rosemont extended beyond securing a new site for the casino. Around the time § 11.2 passed, Kevin Flynn, McMahon, and McQuaid met with several architects about a design for the Rosemont casino; within days, Emerald hired an architecture firm to design the casino. In subsequent weeks, Emerald hired a general contractor and voted to start construction without the Board's prior approval. By October 1999, Emerald had at least nine contracts with construction companies and architecture firms but had not disclosed any of them to the Board, in violation of IGB rules. *See* Ill. Admin. Code tit. 86, § 3000.140(b)(3) ("[L]icensees and applicants for licensure shall periodically disclose changes in or new agreements, whether oral or written, relating to … [c]onstruction contracts.").

Also around this time, Emerald altered its ownership structure by issuing, selling, and reallocating stock. Three separate sets of transactions are important here.

First, after the legislature passed § 11.2 but before the Governor signed it into law, Donald Flynn—Kevin Flynn's father

and an original investor in Emerald who controlled Emerald's board of directors at the time—increased his ownership interest in Emerald from 40 to 74 percent. Then, two days later, he sold some of that stock to twelve outside investors, at least several of whom had connections to Rosemont's mayor and Rosemont's state representative. Donald Flynn sold 294 shares to the twelve outside investors for $6.345 million. He then bought 294 shares from Pedersen and five current shareholders (insiders) for about $10.57 million—resulting in a roughly $4.225 million loss.

Second, Donald Flynn and Pedersen caused Emerald to issue stock to Kevin Flynn, McMahon, Larson, and McQuaid.[4] Several months later, those same defendants each bought additional shares from Donald Flynn.

And third, just after § 11.2 passed, Emerald started selling shares to fulfill a statutory requirement. Emerald's statutory lifeline had come with a hook: to take advantage of the relocation provision in § 11.2(a), Emerald had to have at least 20 percent minority and female ownership (16 percent and 4 percent, respectively) within twelve months of relocating. 230 ILCS 10/11.2(b). So Pedersen began drafting the necessary paperwork while McQuaid began working to find so-called statutory investors who would satisfy the diversity requirement.

---

[4] The same day that Emerald issued the stock, Emerald's board approved a new management structure. The defendants received new job titles with their shares. McMahon, Larson, and McQuaid kept the same responsibilities at Emerald but were given new titles. In addition to the new titles, Larson and McQuaid were elected to the board of directors. This is also when Kevin Flynn first received an official position at Emerald. The board of directors named him an officer, elected him Chairman of the Board, and appointed him as Chief Executive Officer.

McQuaid then met with potential statutory investors and, with the approval of the board of directors, sold shares to twenty-three of them.

Importantly, all of these stock transfers occurred without approval from the Board, even though IGB rules require prior approval from the Board before transferring an ownership interest in a licensee. *See* Ill. Admin. Code tit. 86, § 3000.235(a).

As a part of the ownership restructuring, Emerald amended its Shareholders' Agreement. All existing shareholders (including Pedersen) and all new shareholders (including the other defendants here) executed an Amended Shareholders' Agreement. Paragraph 10 of that agreement required

> Each Shareholder [to] cooperate with the Corporation to provide any disclosure information to the IGB and take any actions necessary to secure the renewal of the Corporation's gaming license. Each Shareholder further agrees to comply with the Act and all rules and orders of the IGB and shall not commit any acts which would jeopardize the license or a renewal thereof.

(Defendants-Appellants' Joint Appendix at 24, ¶ 10.)

Emerald's once-bright future turned bleak, however, after it filed another license-renewal application with the Board in September 1999. The Illinois Riverboat Gambling Act requires the Board "to review applications for the renewal of licenses." 230 ILCS 10/5(c)(11). Fulfilling its statutory obligation, the Board investigated Emerald's application for fifteen months. On January 30, 2001, citing numerous IGB rule violations, the Board voted to deny Emerald's renewal application and to revoke Emerald's license. About a month later, the Board sent Emerald a notice of denial, which informed Emerald that the

Board was not renewing its license, and a disciplinary complaint, which served as the Board's formal basis for revoking Emerald's license.

The district court would later describe the Board's investigation into Emerald's application as "unprecedented and aggressive." *In re Emerald Casino, Inc.*, 530 B.R. at 58. The Board's interest in Emerald seems to have been a result of the Board's belief that Emerald had associated with organized crime in its attempt to relocate to Rosemont (through the outside investors, a construction company, and the mayor's office), a clear violation of IGB rules. *See* Ill. Admin. Code tit. 86, § 3000.110(a)(5).

But the notice of denial and disciplinary complaint included allegations that extended beyond Emerald's alleged ties to organized crime: the Board focused primarily on Emerald's inadequate disclosure of required information. As mentioned above, many IGB rules require licensees to disclose information to the Board. *See* Ill. Admin. Code tit. 86, § 3000.140(a) (imposing general duty on licensees to disclose "material changes in information provided to the Board"); Ill. Admin. Code tit. 86, § 3000.140(b)(3) (requiring disclosure of construction contracts); Ill. Admin. Code tit. 86, § 3000.140(b)(7) (requiring disclosure of any agreement to transfer an ownership interest in a licensee); Ill. Admin. Code tit. 86, § 3000.235(a) (requiring permission from the Board before transferring an ownership interest in a license).

IGB rules put the burden to disclose all required information on the licensee, its agents, and its employees. Ill. Admin. Code tit. 86, § 3000.110(a). To make the importance of disclosure clear, the renewal application warned that misrepresentations or omissions on the application were grounds for

denial of the application and warned that Emerald had an on-going duty to update its disclosures. And as discussed above, Emerald was far from forthcoming in disclosing its agreements with Rosemont, its construction contracts, and its stock transfers.

The Board also took issue with Kevin Flynn's involvement with Emerald before June 1999. During the Board's investigation, Kevin Flynn, McQuaid, and Larson all claimed that Kevin Flynn had no role at Emerald before June 1999—which was false. Indeed, Kevin Flynn had an active role at Emerald well before June 1999: he helped lobby for the relocation legislation; he helped manage Emerald; he attended four of six Emerald board-of-directors meetings held between 1997 and 1999; and he helped negotiate Emerald's move to Rosemont.

So beyond the alleged ties to organized crime, the Board's disciplinary complaint emphasized Emerald's nondisclosure of its early Rosemont agreements, its construction contracts, its stock transfers, and Kevin Flynn's pre-June 1999 involvement in managing Emerald.

Emerald then exercised its statutory right to an administrative hearing on the charges. Three years after the administrative hearing—settlement talks between Emerald, the Board, and the Illinois Attorney General caused the delay—an administrative law judge recommended that the Board revoke Emerald's license. The Board adopted both the administrative law judge's factual findings and recommendation to revoke Emerald's license.

In its final order revoking Emerald's license, the Board listed five official counts. Each count corresponded to a par-

ticular IGB rule that the Board concluded Emerald had violated. Also listed under each count were the acts that violated the relevant IGB rule. But the Board did not list who was responsible for which IGB rule violation; instead, the Board prefaced each count by noting that Emerald violated the given rule "through its officers, employees, representatives, shareholders, Key Persons, and others." (Defendants-Appellants' Joint Appendix at 65, 66, 67, 69.) And after each count, the Board said that, "[b]y failing to comply with [the IGB rule], Emerald has failed to maintain its suitability for licensure. The Board proved Count [number] of the disciplinary complaint which alone supports revocation of Emerald's license pursuant to Section 5(c) of the Act and Subpart K of the Rules." (Defendants-Appellants' Joint Appendix at 66, 67, 68, 70.)

Emerald appealed the Board's final decision to the Illinois appellate court. The court affirmed the Board's decision to revoke Emerald's license, but not in all respects. In particular, the appellate court held that the Board had not proved that Emerald had associated with organized crime.

As the appellate court stressed, the IGB rule does not "hold a licensee 'strictly liable' … for 'associating with members or associates of organized crime.'" (Trustee's Separate Appendix at 144.) Rather, the rule prohibits only "[a]ssociating with, either socially or in business affairs, or employing persons of notorious or unsavory *reputation*." Ill. Admin. Code tit. 86, § 3000.110(a)(5) (emphasis added). The appellate court concluded that, because the Board had relied on confidential FBI documents to show that several people involved in the Emerald-to-Rosemont relocation were connected to organized crime, it had not proved that anyone involved with Emerald had a "notorious or unsavory reputation." Even so,

the appellate court affirmed the Board's decision to revoke Emerald's license because the Board had proved Emerald's other IGB rule violations. The Illinois Supreme Court denied Emerald's petition for leave to appeal.

The Board's decision to revoke Emerald's license is only a piece of this ongoing litigation. When the Board first issued notice of its decision to revoke Emerald's license in early 2001, Emerald's creditors forced it into bankruptcy. Initially filed as a Chapter 7 proceeding, Emerald converted the case into a Chapter 11 restructuring proceeding. The bankruptcy court then created a Creditors' Committee to represent Emerald's creditors' interests. But when Emerald officially lost its license in 2007 and restructuring became infeasible, the bankruptcy court converted the case back into a Chapter 7 liquidation proceeding and appointed Frances Gecker as trustee over Emerald's estate.

The trustee then sued the defendants in bankruptcy court. What matters here are the trustee's breach-of-contract and breach-of-fiduciary-duty claims. In late 2010, the bankruptcy court held an eighteen-day bench trial. Two years later, before the bankruptcy court issued an opinion, the district court pulled the case. The district court then held an additional seventeen days of bench trial; about a year and a half later, the court issued its 281-page decision.

The court dismissed the trustee's breach-of-fiduciary-duty claim, holding that Illinois's five-year statute of limitations barred it. The court also rejected the trustee's argument that, because the defendants controlled Emerald at the time, the statute of limitations had tolled.

The trustee's breach-of-contract claim required significantly more attention. The Amended Shareholder's Agreement required all shareholders to comply with IGB rules. But the Board's final order never established which defendant violated which IGB rule; instead, the order spoke in general terms, noting that Emerald violated the rules "through its officers, employees, representatives, shareholders, Key Persons, and others." Thus, the court had to determine if each defendant had violated an IGB rule listed in the Board's final order. After an extensive 176-page recitation of facts, the court held that each defendant had violated at least one of the nondisclosure rules listed in the Board's disciplinary complaint:

- Kevin Flynn violated Rules 110(a) and 140(a) by failing to disclose his own involvement in managing Emerald before June 1999;[5]
- John McMahon violated Rules 140(a) and 140(b)(3) by failing to disclose Emerald's agreements with Rosemont;
- Kevin Larson violated Rules 110(a) and 140(a) by failing to disclose Kevin Flynn's involvement in managing Emerald before June 1999;
- Joseph McQuaid violated Rules 110(a) and 140(a) by failing to disclose Kevin Flynn's involvement in managing Emerald before June 1999; Rules 110(a), 140(a), and 140(b)(3) by failing to disclose Emerald's agreements with Rosemont and by failing to disclose Emer-

---

[5] Kevin Flynn also violated Rule 110(a) by failing to disclose his ownership of another company, Field Street, and his agreement with a northwest Indiana casino to lobby against Native American casinos in southwest Michigan.

ald's construction contracts; and Rule 235(a) by trans-
ferring shares from Emerald to the statutory investors
without first getting prior Board approval; and

- Peer Pedersen violated Rule 235(a) by arranging the
transfer of shares from five insiders to Donald Flynn
and by selling some of his own shares to Donald Flynn
without getting prior Board approval.

In its breach-of-contract analysis, the court held that Kevin
Flynn's, McMahon's, Larson's, and McQuaid's violations
caused the Board to revoke Emerald's license. Only Pedersen
avoided liability. The court held that, although Pedersen
breached the Amended Shareholders' Agreement, he did not
cause the Board to revoke Emerald's license because the rule
that he violated was one that the Board typically handled with
a fine.

The court then calculated damages by valuing Emerald's
license, which the defendants (minus Pedersen) caused Emer-
ald to lose. To value the license, the court considered bids that
companies had made for Emerald or its license in the past.
The bids ranged from $268 million to $615 million. The court
settled on Midwest Gaming's $272-million bid from 2008. The
court concluded by holding the liable defendants severally li-
able for the loss.[6] This appeal followed.

## II. ANALYSIS

This case contains a number of appeals and cross-appeals.
For clarity, we address all claims related to a particular issue

---

[6] There were six liable defendants—Kevin Flynn, McMahon, Larson,
McQuaid, Donald Flynn, and Walter Hanley—so the court held each re-
sponsible for $45,333,333.34. Donald Flynn and Hanley settled and are no
longer part of this case.

in the same section. First, we address the parties' arguments regarding the trustee's breach-of-contract claim. Second, we address the trustee's argument that the statute of limitations had not run on her breach-of-fiduciary-duty claim. Finally, we turn to damages.

### A. Breach-of-Contract Claims

The parties appeal the district court's decision on the trustee's breach-of-contract claim. We first address Kevin Flynn, McMahon, Larson, and McQuaid's argument that the district court erred in deciding that they caused the Board to revoke Emerald's license. We then address the trustee's argument that the district court erred in deciding that Pedersen did not cause the Board to revoke Emerald's license.

### 1. Causation — Kevin Flynn, McMahon, Larson, McQuaid

None of the defendants[7] dispute the district court's conclusion that they violated IGB rules.[8] Rather, each argues that his conduct did not cause the Board to revoke Emerald's license. So for purposes of this appeal, causation is the only issue that we need to address. "Causation is a question of fact, and our role after a bench trial is to determine whether the judge made

---

[7] Any reference to "the defendants" in this section is limited to Kevin Flynn, McMahon, Larson, and McQuaid.

[8] Of all the defendants, McMahon comes the closest to arguing that he did not violate an IGB rule. He has a subsection in his Statement of the Case titled "McMahon's Supposed IGB Rule Violations." (McMahon's Br. at 2.) But he never challenges the sufficiency of the district court's finding that he violated IGB rules. Only in his reply does he have an argument section titled "John McMahon Did Not Cause Any IGB Rule Violations." (McMahon's Reply at 4.) Arguments made for the first time in a reply brief are waived. *United States v. Waldrip*, 859 F.3d 446, 450 n.2 (7th Cir. 2017).

any clearly erroneous finding." *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 505 (7th Cir. 2006); *see also Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992).

A defendant who has breached a contract is liable only for the damages that the breach caused. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 832 (Ill. 2005). It is a "fundamental principle applicable alike to breaches of contract and to torts that a right of action requires a wrongful act by the defendant and a loss resulting from that act." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1125 (Ill. 2015) (citations and quotation marks omitted). In Illinois, causation is referred to as proximate causation and includes two distinct concepts: cause in fact and legal cause. *Young v. Bryco Arms*, 821 N.E.2d 1078, 1085–1086 (Ill. 2004); *see also In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013) ("Damages which are not the proximate cause of the breach are not allowed."). We consider those elements in order.

*a. Cause in Fact*

To address cause in fact, we ask whether "there is a reasonable certainty that a defendant's acts caused the injury or damage." *Young*, 821 N.E.2d at 1085 (quoting *Lee*, 605 N.E.2d at 502). Illinois courts employ two tests to determine cause in fact. *Turcios*, 32 N.E.3d at 1124; *Young*, 821 N.E.2d at 1085–86. First, a defendant's breach is a cause in fact of damages if the damages would not have occurred had the defendant not breached the contract. *Turcios*, 32 N.E.3d at 1124. This is "the traditional 'but-for' test." *Id.* Alternatively, a defendant's breach is a cause in fact of damages "if it was a material element and a substantial factor in bringing the event about." *Id.* (quoting *Nolan v. Weil-McLain*, 910 N.E.2d 549, 557 (Ill. 2009)).

Courts apply the substantial-factor test when multiple de-
fendants caused the damages so that no one defendant could
be considered a but-for cause. *Young*, 821 N.E.2d at 1085–86.

The defendants contend that the district court erred be-
cause it did not and could not have determined that "*each in-
dividual defendant's breach caused injury to Emerald*."[9] (Kevin
Flynn's Br. at 35.) The defendants have accurately framed the
court's decision. As the court said in its response to the parties'
motions for reconsideration, it "did not find that any individ-
ual Defendant's failure to disclose a piece of information
would have, by itself, prompted the IGB investigation and
revocation proceedings." *In re Emerald Casino, Inc.*, 538 B.R.
417, 425 (N.D. Ill. 2015). The court instead focused on the to-
tality of the defendants' conduct. *Id.* at 424–25; *see also In re
Emerald Casino, Inc.*, 530 B.R. at 203.

But the district court's focus on the defendants' conduct as
a whole does not necessarily mean that its cause-in-fact anal-
ysis is flawed.[10] The substantial-factor test was designed for

---

[9] The defendants make a related argument that requires little of our time.
They argue that the district court erred in its causation analysis because it
never determined that each was one-sixth responsible for the damages.
Apportionment of responsibility is a damages question, which we tackle
below in Part C.

[10] We acknowledge that, in a single sentence unaccompanied by any ad-
ditional analysis, the district court held that the but-for test was met here
because "absent Defendants' violations of IGB rules, the IGB would not
have revoked the license." *In re Emerald Casino, Inc.*, 530 B.R. at 203. The
but-for test does not work in a case like this one: if one defendant had not
breached, there were still three other defendants who violated IGB rules.
Thus, but for any one defendant's conduct, the Board could still have re-
voked Emerald's license because of the other defendants' conduct. Any

this type of situation. "[W]hen, as here, there are multiple factors that may have combined to cause the injury, we ask whether [the] defendant's conduct was a material element and a substantial factor in bringing about the injury." *Young*, 821 N.E.2d at 1086.

When revoking Emerald's license, the Board relied on a limited number of IGB rules and a limited number of acts that violated those rules. As the district court correctly concluded, "the IGB attached significant weight to the[] violations in making its determination to revoke the license." *In re Emerald Casino, Inc.*, 530 B.R. at 203. Thus, it was reasonable for the court to conclude that each violation was a material element and substantial factor in the Board's decision to revoke Emerald's license. And because the defendants were all responsible for at least one of those violations, each defendant was a cause in fact of Emerald's damages. That the Board might not have revoked Emerald's license for any one defendant's conduct alone is irrelevant for the substantial-factor test.

### b. Legal Cause

Foreseeability is the touchstone of our legal-cause analysis. *Turcios*, 32 N.E.3d at 1124; *see also Talerico v. Olivarri*, 796 N.E.2d 1083, 1086 (Ill. App. Ct. 2003). A defendant's conduct is a legal cause of damages if the damages were a likely and thus a foreseeable result of the defendant's conduct. *Turcios*, 32 N.E.3d at 1124. If the damages were not a foreseeable result of the defendant's conduct, a plaintiff can still recover if the parties contemplated the damages at the time of contracting. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d

---

problem with the court's but-for analysis is irrelevant, however, because the substantial-factor test applies here.

61, 67 (Ill. 1987); *see also* Restatement (Second) of Contracts § 351 (1981).

The defendants argue that the Board's decision to revoke Emerald's license for violating nondisclosure-related rules was unforeseeable.

We disagree. On legal cause, there are two reasons why revocation was a foreseeable result of the defendants' failure to comply with IGB rules. The first concerns the Board's authority to revoke licenses for IGB rule violations. Illinois law vests the Board with the authority to "suspend, revoke or restrict licenses … and to impose civil penalties … for each violation of any provision of the Act [or] any rules adopted by the Board … or any other action which, in the Board's discretion, is a detriment or impediment to riverboat gambling operations." 230 ILCS 10/5(c)(15).

The defendants argue that the Board's wide discretion made it unforeseeable that the Board would revoke Emerald's license for violating nondisclosure-related rules. But the statute put the defendants on notice that the Board *could* revoke Emerald's license for failing to abide by *any* IGB rule. It would be anomalous to hold that the Board's discretion somehow made it unforeseeable that the Board would revoke Emerald's license. "The question asked is whether a reasonably prudent person in the position of the breaching party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of this type of breach." *Contempo Design, Inc. v. Chi. & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 554 (7th Cir. 2000). And here, the Board's authority would have put a reasonably prudent person on notice of the potential consequences for violating IGB rules.

In response, the defendants argue that revocation was unforeseeable because the Board had never revoked a license before; the Board instead traditionally just imposed fines for IGB rule violations. According to the defendants, revocation for nondisclosure violations was "highly extraordinary" and thus was not foreseeable. *See Turcios*, 32 N.E.3d at 1124. Whatever the merits of that argument, the defendants pose a question factually different from the one we have to address.

Recall that the Board voted unanimously in 1997 to deny Emerald's license-renewal application. The Board decided not to renew Emerald's license at that time in part because Emerald had violated IGB rules. The complaint referenced Emerald's past discipline "for failing to disclose and obtain approval for certain transactions." (R. 450 at Ex. 129.) Emerald had refinanced its debt, loaned money to shareholders, and issued stock options to Donald Flynn, all without prior Board approval.

Admittedly, the Board never revoked Emerald's license: Emerald's extensive lobbying efforts proved fruitful, and the Illinois legislature passed § 11.2. But the defendants cannot hinge their argument here on the Board's failure to revoke a license for nondisclosure-related rule violations when the Board had in fact tried to do so in the past.

The second reason revocation was foreseeable is that Paragraph 10 of the Amended Shareholders' Agreement expressly contemplated the need to comply with the Board and IGB rules. The paragraph specifically warned that shareholders "shall not commit any acts which would jeopardize the license" or its renewal. (Defendants-Appellants' Joint Appendix at 24, ¶ 10.)

Under Illinois law, "all damages which naturally and generally result from a breach are recoverable; it is only where damages are the consequence of special or unusual circumstances that it must be shown that the damages were within the reasonable contemplation of the parties." *Midland Hotel Corp.*, 515 N.E.2d at 67. Paragraph 10 serves both purposes: it not only shows that license revocation was foreseeable—for why else would Emerald have known it was necessary to protect against that risk—but it also shows that license revocation was "reasonably within the contemplation of [the] defendant[s] at the time the contract was entered into." *Equity Ins. Managers of Illinois, LLC v. McNichols*, 755 N.E.2d 75, 80 (Ill App. Ct. 2001). In fact, the attorney who drafted the Amended Shareholders' Agreement testified that Paragraph 10 was included to protect Emerald from the risk that IGB rule violations would cost Emerald its license. The defendants cannot now argue that it was unforeseeable that violating IGB rules would cause the Board to revoke Emerald's license.

Finally, the defendants contend that they could not have foreseen that the Board would wrongly claim that Emerald had associated with organized crime—which is what they claim was the Board's primary concern when revoking Emerald's license. The Board's concern about Emerald's alleged ties to organized crime is apparent from the record. The defendants *may not* have been able to foresee that the Board would suspect Emerald had ties to organized crime.[11] But they knew

---

[11] We note that the Illinois appellate court held only that confidential documents did not prove that Emerald had associated with people having an "unsavory reputation." Ill. Admin. Code tit. 86, § 3000.110(a)(5). The court's decision stops short of holding that Emerald had no connection to organized crime.

that the Board would review Emerald's renewal application. *See* 230 ILCS § 10/5(c)(11).

And the Board's final order belies any argument that the only reason the Board revoked Emerald's license was its concern about organized crime. In twenty-seven pages of facts, organized crime is mentioned only a handful of times. Nor do the actual counts rely heavily on Emerald's alleged ties to organized crime. Organized crime appears under just one official count—Count V, Rule 110(a)—and in only two of eleven factual allegations related to that count. And both of those factual allegations also relate to other violations—Emerald's failure to get prior approval before transferring shares and its failure to disclose its construction contracts.

Accordingly, the district court did not clearly err in holding that Kevin Flynn, McMahon, Larson, and McQuaid all caused the Board to revoke Emerald's license.

*2. Causation — Pedersen*

As to Pedersen, the trustee argues that the district court erred in holding that Pedersen's IGB rule violation did not cause the Board to revoke Emerald's license. Again, causation is a question of fact that we review for clear error. *Wis. Mut. Ins. Co.*, 441 F.3d at 505; *see also Lee*, 605 N.E.2d at 502.

The district court *could have* held that Pedersen's failure to get preapproval before transferring Emerald stock was a cause in fact of the Board's decision to revoke Emerald's license: IGB rules require getting Board approval before transferring stock, the Board's final order outlined several transfers that occurred without prior approval, and Pedersen participated in at least one of those transfers.

But substantial evidence supports the district court's decision not to do so. First, the Board had a long history of condoning the transfer of shares without prior approval. The Board frequently approved transfers after the fact; if it later determined that a shareholder was an unsuitable owner, it simply required parties to undo the transaction. An IGB rule even anticipates that situation, requiring licensees to "provide a means for the economic disassociation of a Key Person in the event such economic disassociation is required by an order of the Board." Ill. Admin. Code tit. 86, § 3000.224(a).

Second, the court noted that on the same day that the Board first voted to revoke Emerald's license, the Board approved a settlement agreement with another Illinois casino. In that case, the casino transferred 98 percent ownership to an investor without prior Board approval, and the Board required only that the investor divest his interest in the casino.

Finally, and most importantly, evidence presented at trial suggested that the Board had already approved of the transfer of shares from Pedersen and the five insiders to Donald Flynn. A supplemental staff report stated that the "failure to disclose the purchase of shares by Donald Flynn from Peer Pedersen" had "either been resolved" or been "determined to be irrelevant." *See In re Emerald Casino, Inc.*, 530 B.R. at 204. And Pedersen's role in those transactions was the only way in which the district court held that Pedersen violated IGB rules.[12]

---

[12] The trustee also argues that the district court clearly erred in holding that Pedersen did not violate any other IGB rules. Regarding Pedersen's role in any of the other transfers of Emerald shares that occurred without prior Board approval, the district court held that "[h]istorically, the IGB did not require pre-approval of shareholders and had not disciplined licensees for voting to sell shares of stock." *In re Emerald Casino*, 530 B.R. at

The trustee argues in response that the district court was precluded from holding that Pedersen did not cause the Board to revoke Emerald's license. According to the trustee, the Board and the Illinois appellate court had already determined that the defendants caused Emerald to lose its license, so the court was precluded from deciding otherwise.

"State administrative findings that have been subjected to state judicial review are entitled to both claim and issue preclusive effect in federal courts." *Staats v. Cty. of Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000). Under Illinois law, issue preclusion applies if (1) the issue decided in the prior case is identical to the issue in the current case, (2) there was a final judgment on the merits in the prior case, and (3) the party against whom issue preclusion is asserted was a party or in privity with a party to the prior case. *Herzog v. Lexington Twp.*, 657 N.E.2d 926, 929–30 (Ill. 1995).

The trustee's issue-preclusion argument fails at the first step: the trustee cannot show that the issue here is the same issue that was before the Illinois appellate court. The Illinois appellate court addressed whether the Board had proved that Emerald had violated IGB rules, which would then trigger the Board's authority to revoke Emerald's license. The court did not address who violated which IGB rule. Nor did the court decide whether a particular IGB rule violation caused the

203. Thus, the court's analysis on the transfer of shares from Pedersen and the five insiders to Donald Flynn applies with equal force to the other transfers.

As to any other potential IGB rule violations, the district court faced a staggering amount of factual detail and conflicting evidence. The court gave serious consideration to both sides of the arguments and ruled for Pedersen. Those decisions were not clearly wrong.

Board to revoke Emerald's license. All that it did was affirm the Board's decision that some violations occurred and that "[e]ach one …, standing alone, could support a revocation of Emerald's gaming license." (Trustee's Separate Appendix at 146.) That conclusion does nothing more than reiterate the Board's authority to "revoke … licenses … for each violation of any provision of … any rules adopted by the Board." 230 ILCS 10/5(c)(15).

At no point did the Illinois appellate court address whether Pedersen's or any other defendant's conduct caused the Board to revoke Emerald's license.[13] The district court was thus not precluded from holding that Pedersen's conduct did not cause the Board to revoke Emerald's license.

And for those reasons, the district court did not clearly err in holding that Pedersen did not cause the Board to revoke Emerald's license.

*B. Breach-of-Fiduciary-Duty Claims*

The district court dismissed the trustee's breach-of-fiduciary-duty claim, finding that Illinois's five-year statute of limitations barred it. *See* 735 ILCS 5/13-205; *Hassebrock v. Ceja Corp.*, 29 N.E.3d 412, 420 (Ill. App. Ct. 2015). On appeal, the trustee argues that the statute of limitations had not run on the claim because the cause of action accrued later than the court assumed. Alternatively, the trustee contends that even if the cause of action accrued more than five years before she

---

[13] The trustee's other deference-related arguments fail for the same reason: the decisions that the Board and Illinois appellate court made did not address causation and breach of contract.

filed suit, the limitations period had tolled while the defendants controlled Emerald.

To start, we must decide when the statute of limitations began running. In Illinois, the statute of limitations begins running when the plaintiff knows or reasonably should know that that the defendant's wrongful acts have caused damages. *Nolan v. Johns-Manville Asbestos*, 421 N.E.2d 864, 868 (Ill. 1981).

The trustee's breach-of-fiduciary-duty claim is based on the same acts underlying the Board's decision to revoke Emerald's license. Thus, as the district court held, the cause of action accrued at least by January 30, 2001, when the Board first voted to revoke Emerald's license. At that time, Emerald was on notice that the defendants' wrongful acts had caused it damages.

When the trustee filed suit on December 19, 2008, nearly eight years had passed since the Board first voted to revoke Emerald's license. Based only on those dates, the statute of limitations bars the trustee's breach-of-fiduciary-duty claim.

The trustee argues, however, that the statute of limitations was tolled while the defendants controlled Emerald. Under this theory, the statute of limitations did not actually begin running until March 20, 2008, when the bankruptcy court appointed the trustee over the bankruptcy estate.

The trustee relies on *Lease Resolution Corporation v. Larney* to support that argument. 719 N.E.2d 165, 170–72 (Ill. App. Ct. 1999). In *Larney*, the Illinois appellate court adopted the adverse-domination doctrine, which "is an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors." *Id.* at 170.

The doctrine "creates a rebuttable presumption that knowledge of the injury will not be available to the corporation as long as the corporation is controlled by wrongdoing officers and directors." *Id.* at 173. A defendant can overcome that presumption by showing "that someone other than the wrongdoing directors had knowledge of the cause of action and both the ability and the motivation to bring suit." *Id.*

Even though *Larney* is an intermediate-appellate-court decision, district courts applying Illinois law are to give it persuasive weight. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 936 (7th Cir. 2012). We review the district court's application of the adverse-domination doctrine to the facts of this case for clear error. *See Keach v. U.S. Trust Co.*, 419 F.3d 626, 634 (7th Cir. 2005).

Although the district court considered *Larney* here, it concluded that the defendants were able to rebut the presumption that their control over Emerald had tolled the statute of limitations. According to the court, the Creditors' Committee, which was created to represent Emerald's creditors' interests in bankruptcy, had the knowledge, ability, and motivation to sue the defendants for breach of their fiduciary duties.

The trustee disagrees. She first focuses her argument on the Illinois appellate court's adoption of the "majority" adverse-domination doctrine. Under this version of the doctrine, only a majority of the board members have to be wrongdoers for the doctrine to apply. *Larney*, 719 N.E.2d at 171–72. In *Larney*, the Illinois appellate court rejected the complete-domination theory, which would have required a plaintiff to show that the entire board was composed of wrongdoers for the doctrine to apply. *Id.* According to the trustee, "by adopting

the 'majority domination' version of the doctrine, *Larney* necessarily rejected the position that the mere presence of an innocent party with knowledge of wrongdoing will defeat tolling." (Trustee's Br. at 88.)

True, but the trustee overreads the "majority" aspect of Illinois's adverse-domination doctrine. All the majority-domination rule does is relieve plaintiffs of the burden of showing that every board member was a wrongdoer. Any concern that a potential plaintiff may have knowledge of the claim but no way to sue is covered in the defendants' burden of proving that someone had the *ability* to sue. The majority part of the rule serves no purpose in that regard.

The trustee next argues that the Creditors' Committee was unable to sue. She admits that, under bankruptcy law, a creditor can bring a derivative claim on behalf of a bankruptcy estate. *In re Consol. Indus.*, 360 F.3d 712, 716 (7th Cir. 2004).[14] But she notes that creditors must satisfy certain requirements before they can sue. To bring a claim, a creditor "must show that the [debtor] has unjustifiably refused the creditor's demand to pursue a colorable claim and obtain leave from the bankruptcy court to proceed." *Id.*

The trustee argues that a creditor's need to get leave from the bankruptcy court makes the creditor unable to bring a derivative claim. To support her argument, the trustee emphasizes that during this litigation, before the district court pulled

---

[14] Officers and directors owe fiduciary duties to the corporation, not individual shareholders. *Alpha Sch. Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1158 (Ill. App. Ct. 2009). Thus, the trustee's breach-of-fiduciary duty claim is brought on behalf of the bankruptcy estate, which is all that remains of Emerald.

the case, the bankruptcy court said that the likelihood of a bankruptcy court granting creditors leave "in a Chapter 11 case when the management of the debtor is attempting to reorganize is dubious." (Trustee's Appendix at 28.)

We don't read the ability-to-sue requirement as narrowly as the trustee does. The Creditors' Committee had the ability to sue, albeit circumscribed by several requirements. But those limitations didn't render the Creditors' Committee unable to sue. Even outside of the bankruptcy context, there is a prerequisite before a shareholder can bring a derivative suit: corporate law requires a shareholder to demand that the corporation pursue the action before bringing the claim derivatively. *Valiquet v. First Fed. Sav. & Loan Ass'n of Chi.*, 408 N.E.2d 921, 925 (Ill. App. Ct. 1979). Only if demand is excused or wrongfully refused can a shareholder then bring the claim on the corporation's behalf.[15] So the mere existence of a potential barrier to suing did not negate the Creditors' Committee's ability "to enforce a corporate cause of action against officers, directors, and third parties." *In re Huron Consulting Grp., Inc. S'holder Derivative Litig.*, 971 N.E.2d 1067, 1076 (Ill. App. Ct. 2012) (emphasis omitted) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991)).

If the Creditors' Committee had petitioned the bankruptcy court, and if the court had denied leave, only then could we say that the committee was unable to bring the claim. The trustee cannot rely on the bankruptcy court's conjectural after-

---

[15] That demand might have been excused in this case, *see Valiquet*, 408 N.E.2d at 925, does not negate the point. What matters here is that the Creditors' Committee had an avenue for bringing the derivative claim in the same way that shareholders can bring derivative claims against corporations generally.

the-fact statement to prove inability to sue; that the bankruptcy court *might* have denied leave is insufficient. The Creditors' Committee actually had to present the issue to the bankruptcy court.

Likewise, the Creditors' Committee was motivated to sue. The trustee claims that, until the Illinois Supreme Court denied Emerald's petition for review, "Emerald was still attempting to sell its License, and a lawsuit on behalf of Emerald accusing Defendants of breaching IGB Rules would have amounted to a concession that Emerald was not lawfully entitled to that License." (Trustee's Br. at 92–93.) To the trustee, the Creditors' Committee did not have the motivation to sue because "[a] successful License sale would have provided the quickest and fullest recovery for Emerald's creditors." (Trustee's Br. at 94.)

The trustee's point is well taken—at the time these events were unfolding, selling the license might have seemed the creditors' best method of recovery. And at least as the trustee presents the argument, the Creditors' Committee had two choices: either try to sue the defendants or hope that Emerald could sell its license.

But that strikes us as posing a false dichotomy: the Creditors' Committee could have sued the defendants while hoping that Emerald would sell its license. The Board voted to revoke Emerald's license on January 30, 2001 based on Emerald's IGB rule violations. But in August 2002, the Board and the Illinois Attorney General conditionally agreed to settle their claims against Emerald and to allow Emerald to auction off the license. In March 2004, the Board and Emerald held an auction and selected a winning bidder. Only when Emerald failed to satisfy certain conditions of the settlement did the Attorney

General refuse to approve the sale and reinstate disciplinary proceedings. *See Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 930–31, 934–35 (7th Cir. 2007).

Based on that record, the Creditors' Committee did not have to make a choice at all. The Board and the Illinois Attorney General knew about Emerald's IGB rule violations yet decided not to revoke Emerald's license. They had instead decided to allow Emerald to sell the license—the remedy that the Creditors' Committee allegedly wanted. The Creditors' Committee thus could have pursued a derivative action against the defendants without fear that the Board would prevent Emerald from selling its license.

And even if the trustee is right and the Creditors' Committee had to choose between litigation and trying to sell the license, our analysis would not change. As the trustee argued, the Creditors' Committee thought that "[a] successful License sale would have provided the quickest and fullest recovery for Emerald's creditors." (Trustee's Br. at 94.) The Creditors' Committee made a strategic decision not to sue. Parties make numerous strategic decisions in every case. Whether to sue at all is one decision that every plaintiff must make; nonlitigation means of settling disputes are always an option. But would-be plaintiffs must live with their choice. A plaintiff did not lack motivation to sue just because its chosen course of action proved to be unsuccessful in the end. *Cf. Myers v. Centralia Cartage Co.*, 419 N.E.2d 465, 468 (Ill. App. Ct. 1981) ("The mere pendency of negotiations conducted in good faith and with a view of compromise, during the period of the statute of limitations, however, is not sufficient to show a waiver of the statute and does not estop the defendant from asserting the defense.").

For those reasons, the district court did not clearly err in refusing to apply the adverse-domination doctrine in this case. Thus, the statute of limitations bars the trustee's breach-of-fiduciary-duty claim.

*C. Damages*

Turning finally to damages, we first address the district court's valuation of damages and then address the court's decision to hold the defendants severally liable.

The district court valued Emerald's license at $272 million based on a bid that the Board received for Emerald's license in 2008.[16] The defendants[17] challenge that valuation as clear error.[18] Their argument is that damages are based on the time of breach, which they claim occurred in 2001. According to the defendants, the court erred by not adjusting $272 million from 2008 dollars (when the Board received the bid) to 2001 dollars (when the breaches occurred) to account for inflation. We review the district court's damages award for clear error. *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 598 (7th Cir. 2009).

The defendants are right in one respect: "[d]amages are measured as of the date of breach." *Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692 (7th Cir. 1990); *see also 1472 N.*

---

[16] After Emerald's license revocation became final, the Board auctioned off the license. This is where Midwest Gaming's $272-million bid came from.

[17] All references to "the defendants" in this section are to the remaining liable defendants—Kevin Flynn, McMahon, Larson, and McQuaid.

[18] The trustee accepts the $272 million value, arguing only that if we find the district court clearly erred in valuing the license, that it undervalued the license.

*Milwaukee, Ltd. v. Feinerman*, 996 N.E.2d 652, 658 (Ill. App. Ct. 2013). But they waived this argument by not making it at the district court.

As best we can tell from the record, the defendants never argued to the district court that the court needed to adjust the $272-million award to account for inflation.

On appeal, the defendants contend that they did not waive this argument, citing a quote from their posttrial memorandum that "[U]nder Illinois law 'the proper date for determining damages in a breach of contract action is the date of the breach, not the date of trial.'" (Kevin Flynn's Reply Br. at 48 (quoting (R. 251 at 273)).) But that quote appears in a discussion related to the trustee's expert's prejudgment-interest analysis. And regurgitating a general rule of law for a different argument falls well short of preserving the specific argument that the defendants try to make here. *See United States v. Burns*, 843 F.3d 679, 685 (7th Cir. 2016).

Kevin Flynn's citation to his posttrial memorandum in his reply brief contains an "*E.g.*," signal. As "*e.g.*," is the signal used in legal citation when "other authorities also state the proposition, but citation to them would not be helpful or is not necessary," we assume that this is the best the defendants can come up with. The Bluebook: A Uniform System of Citation R. 1.2(a) at 58 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015). And we found no evidence that the defendants made this argument at the district court in our own review of the record: they didn't even make the argument in their motion to reconsider damages.

Even if the defendants did not waive the argument, the district court did not clearly err. The court considered ten bids

for Emerald or its license; the bids ranged from $216 million to $615 million and spanned from 2001 to 2008. After a thorough analysis, the court concluded that a $272-million bid from 2008 best reflected the value of Emerald's license.

And $272 million, although from 2008, reasonably reflected the value of Emerald's license in 2001. In 1999, Emerald sold stock to the statutory investors. During that process, Kevin Flynn's company, EVI, valued Emerald at $307.5 million; Emerald then sold stock to the statutory investors according to that valuation. The court decided "that these completed transactions constitute additional market evidence that supports the reliability of [EVI's] valuation." *In re Emerald Casino, Inc.*, 530 B.R. at 232.

In 2000, in related litigation, Kevin Flynn and McQuaid presented expert testimony that valued Emerald between $268–$272 million as of July 1, 1999, between $286–$295 million as of October 18, 1999, and between $308–$310 million as of June 1, 2000. The court gave the report minimal weight because it was not based on offers to buy Emerald. But the court also noted that it was useful insofar as "it was prepared on behalf of certain Defendants in a situation where Defendants had an incentive to present a modest valuation in order to reduce their potential liability." *Id.*

As the court stated as it concluded its damages-valuation analysis, "These similar bids bolster the conclusion that the Midwest Gaming bid is an appropriate basis for determining the market value of the license." *Id.* at 234. Given how similar the $272-million bid that the court used is to the indicators of Emerald's value around the time of breach, the court did not clearly err in not adjusting the total value of damages to account for inflation.

The second issue on appeal about damages is the district court's decision to hold the defendants severally liable. The trustee argues that the court should have held the defendants jointly and severally liable. The defendants argue that the court never decided that each was one-sixth responsible for the damages and thus could not hold them severally liable in that amount.

The court clearly erred here by not holding the defendants jointly and severally liable. In Illinois, parties are generally jointly and severally liable for a breach of contract only if the contract imposes a joint and several obligation. *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1283 (Ill. App. Ct. 2002). We don't quibble with the court's conclusion that the defendants had individual responsibilities to comply with Paragraph 10 of the Amended Shareholders' Agreement: the defendants signed separate Amended Shareholders' Agreements, which required each defendant personally to comply with IGB rules. That has been a consistent ruling throughout the course of related litigation. *Flynn v. Levy*, 832 F. Supp. 2d 951, 956 (N.D. Ill. 2011).

But the court erred in rejecting what is called the concurrent-breach doctrine. *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1029–30 (Ill. App. Ct. 2012). Under the concurrent-breach doctrine, "[w]hen two defendants independently breach separate contracts, and it is not 'reasonably possible' to segregate the damages, the defendants are jointly and severally liable." *Id.* at 1030 (quoting *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 740 (Minn. 1997)). The district court decided not to apply the concurrent-breach doctrine from *InsureOne*, despite acknowledging that, "[a]t first blush, this doctrine appears to fit the facts of this case well." *In re*

*Emerald Casino, Inc.*, 530 B.R. at 209. In rejecting *InsureOne*, the court reasoned "that [because] only one Illinois Appellate Court has extended the doctrine of concurrent breach to Illinois, the court is not convinced that the Illinois Supreme Court would adopt this new approach and therefore applies the general rule that independent contractual obligations do not give rise to joint and several liability." *Id.* at 210.

We "review de novo the district court's determination of the content of state law." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636 (7th Cir. 2002) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233–34 (1991)).

When applying state law, federal courts are bound by the decisions of the state's highest court. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37 (1940). When a state's high court has not ruled on a matter, a federal court's job is to decide the case like the state's high court would if presented the issue. *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). Although not binding, intermediate-state-court decisions serve as guidance in a federal court's quest to decide a case like a state's high court would. *Id.* at 1087–88. When an intermediate state court announces a rule of law, "that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state *would decide otherwise*." *West*, 311 U.S. at 237 (emphasis added).

So a federal court applying state law should apply the law as announced by intermediate state courts unless there are reasons that convince the federal court that the state's high court would rule differently. The district court here rejected *InsureOne* not because it was convinced that the Illinois Supreme Court wouldn't apply *InsureOne* but because it wasn't

convinced that the Illinois Supreme Court would apply *In-sureOne*. That has the analysis exactly backwards.

And we see no reason to believe that the Illinois Supreme Court would reject the concurrent-breach doctrine. "The [*In-sureOne*] court was the first and is so far the only Illinois appellate court to discuss the … doctrine, and its holding has not been undermined by intervening Illinois precedent." *Indep. Trust Corp.*, 665 F.3d at 936 (applying that principle to the adverse-domination doctrine).

Moreover, the doctrine is a reasonable way to solve the unusual damages-allocation problem presented in cases like *InsureOne*. And this case is identical to *InsureOne* in all material respects. There, the defendants all violated independent covenants not to compete; the combined violations caused damages; and the court could not have reasonably segregated damages among the defendants according to fault. Here, as there, the defendants all breached the Amended Shareholders' Agreement by violating IGB rules; the combined violations caused the Board to revoke Emerald's license; and the district court could not have reasonably segregated damages among the defendants according to fault.

Indeed, the district court here simply split damages equally among the defendants without reference to each's relative culpability. And splitting damages according to fault would have been nearly impossible given that the court consistently highlighted the Board's emphasis on the totality of Emerald's IGB rule violations. It thus makes sense to apply the concurrent-breach doctrine here.

Contracts allocate risk to the party best able to bear it. *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 456

(7th Cir. 1994). That risk fell to the defendants. Emerald, the licensee, had to comply with IGB rules; but Emerald, a legal entity, could act only through its officers, directors, shareholders, and other employees. It was only natural to impose that obligation on those people. Of course, the defendants never intended to pay for the cost of a revoked license. But the way to avoid liability was to abide by IGB rules. The defendants "argument that they should be relieved of their promise because [damages caused by noncompliance proved] more costly than they anticipated is a poor excuse, for contracts are designed to allocate risks such as this." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000).

In valuing damages, the district court apportioned the $272 million equally among six defendants: Kevin Flynn, McMahon, Larson, McQuaid, Donald Flynn, and Walter Hanley. Instead of appealing, Donald Flynn and Walter Hanley settled with the bankruptcy estate after trial. At oral argument, the trustee informed the court that Donald Flynn had settled for $45,333,333.34 (the trial court judgment in full) and that Walter Hanley had settled for $7 million. Thus, the remaining defendants are jointly and severally responsible for $272 million minus $52,333,333.34, for a total of $219,666,666.66.

### III. Conclusion

For those reasons, the district court's decisions on the trustee's breach-of-contract and breach-of-fiduciary-duty claims are AFFIRMED. Further, the district court's valuation of damages is AFFIRMED. But because the district court erred in refusing to apply the concurrent-breach doctrine and hold the

defendants jointly and severally liable, the district court's allocation of damages is VACATED and REMANDED for resolution consistent with this opinion.